UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
CLEAR WIRELESS LLC,

       Plaintiff,

   -against-         **MEMORANDUM OF**
               **DECISION AND ORDER**
BUILDING DEPARTMENT OF THE  10-CV-5055 (ADS) (ETB)
VILLAGE OF LYNBROOK, BOARD OF
TRUSTEES OF THE VILLAGE OF
LYNBROOK and VILLAGE OF LYNBROOK,

       Defendants.
-------------------------------------------------------X

**APPEARANCES:**

**Ré, Nielsen, Huber & Coughlin, LLP**
Attorneys for the plaintiff
36 North New York Avenue
Huntington, NY 11743
  By: John P. Huber, Esq., Of Counsel

**Ledwith & Atkinson**
Attorneys for the defendants
14 St. James Place
Lynbrook, NY 11563
  By: Peter K. Ledwith, Esq., Of Counsel

**SPATT, District Judge**.

  In this case, the plaintiff Clear Wireless LLC ("Clearwire") alleges that the Building Department of the Village of Lynbrook ("Building Department"), the Board of Trustees of the Village of Lynbrook ("the Board"), and the Village of Lynbrook ("the Village" and collectively "the Village Defendants") denied its request for a special use permit to construct a wireless telecommunication facility, in violation of the Telecommunications Act of 1996 (the "TCA"), 47 U.S.C. § 332(c)(7) and Articles 30 and 78 of the New York Civil Procedure Law and Rules.

Presently before the Court are Clearwire's motion for summary judgment and the Village Defendants' cross-motion for summary judgment. For the reasons set forth below, the Court denies Clearwire's motion for summary judgment and grants the Village Defendants' cross-motion for summary judgment.

## I. BACKGROUND

Clearwire is an affiliate entity of Sprint Nextel ("Sprint"), and provides the wireless broadband component of Sprint's telecommunications network in Nassau County, New York. Clearwire's wireless broadband service, also known as "wireless broadband Internet access service" is referred to as "fourth generation" or "4G", because it is the fourth version of the technology used to transmit data over Sprint's telecommunications network. As explained by Clearwire, "4G merges voice, video and other information into a single wireless platform available to Sprint's end users via their mobile devices such as telephone and 'smartphones'". (Pl.'s 56.1 Stmt., ¶ 3.)

On February 4, 2010, Clearwire began the application process in the Village of Lynbrook to obtain a special use permit to construct and operate a telecommunications facility consisting of antennas and related equipment ("the Proposed Facility") on the rooftop of an existing commercial building at 444 Merrick Road in Lynbrook, New York. The Proposed Facility is what is referred to in the telecommunications industry as an aggregator point of presence or "AggPoP" site, because it "serve[s] as [a] data aggregation[] point[] that combine[s] data from surrounding cellular sites and forward[s] the data to switching centers through an optical fiber network". (Pl.'s 56.1 Stmt., ¶ 29.) In particular, the Proposed Facility was designed to be the AggPoP site for Sprint's Long Island South cluster, which would connect 135 cites covering Western, Southern, and Central Nassau County, as well as parts of Queens and Suffolk County.

On June 7, 2010 and July 19, 2010, the Board held public hearings on Clearwire's application. At the hearings, Clearwire presented the live testimony of five expert witnesses and answered questions from the Board and the public. The majority of the questions centered on health and safety concerns; the need for 4G service generally; and the need to locate the Proposed Facility at the building on 444 Merrick Road.

On October 4, 2010, the Board denied Clearwire's application for a special use permit. (See Resolution & Decision, Ex. L.) Among the reasons for denying the application was the Board's belief that, because 4G service is an "advanced Internet product", the application was not entitled to the higher level of review afforded to telecommunications services under the Telecommunications Act of 1996. The Board based this conclusion on the D.C. Circuit's decision in Comcast Corporation v. Federal Communications Commission, 600 F.3d 642 (D.C. Cir. 2010). Thus, the Board only analyzed Clearwire's application under the criteria set forth in the Village Code.

Based on the criteria set forth in the Village Code, the Board denied Clearwire's application because: (1) the Proposed Facility would increase the height of an already non-conforming building, which would violate the Village Code and work against the Village's goal to "bring forward Downtown beautification programs and a restoration of a sense of suburban hometown atmosphere"; (2) "a hand-held Internet station is not a 'need' as contemplated in either statute or Court decisions reviewing municipal action in regulating the erection of wireless towers and antennae"; and (3) Clearwire had failed to show the building at 444 Merrick Road was "the only suitable location for its installation". (Ex. L.)

On November 2, 2010, Clearwire filed the instant complaint against the Village Defendants alleging that the denial of its application was not supported by substantial evidence

3

and was arbitrary and capricious in violation of federal and state law. Clearwire's first cause of action sought declaratory and injunctive relief under federal law pursuant to: (1) the Telecommunications Act of 1996; (2) Rules 56 and 57 of The Federal Rules of Civil Procedure; and (3) the Declaratory Judgment Act, 28 U.S.C. §§2201–2202 ("the federal cause of action"). In its second cause of action, Clearwire sought declaratory and injunctive relief under state law, specifically Articles 30 and 78 of the New York Civil Procedure Law and Rules ("the state cause of action").

Clearwire now moves for summary judgment on both causes of action. The Village Defendants cross-move for summary judgment with regard to the same claims.

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 170 (2d Cir. 2006). In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam), and Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)).

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party to present "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party may not then rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). If the evidence favoring the nonmoving party is "merely colorable . . . or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477, U.S. 242, 249–50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (internal citations omitted).

## B.  As to the Federal Cause of Action

The parties seek summary judgment on Clearwire's first cause of action, seeking declaratory and injunctive relief based on the Village Defendants' purported violation of the TCA.

The Telecommunications Act of 1996 is "an omnibus overhaul of the federal regulation of communications companies," the purpose of which is to "provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services ... by opening all telecommunications markets to competition . . . ." Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 637 (2d Cir. 1999) (quoting H.R. Conf. Rep. No. 104–458, at 113 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 124). "One of the means by which [Congress] sought to accomplish these goals was reduction of the impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers." City of Rancho Palos Verdes, Cal. v. Abrams, 544 U.S. 113, 115, 125 S. Ct. 1453, 161 L. Ed. 2d 316 (2005). Thus, Congress amended the TCA to include 47 U.S.C. § 332(c)(7) ("Section 332(c)(7)"), which "preserved the

authority of state and local governments over zoning and land use issues, but imposed limitations on that authority." New York SMSA Ltd. P'ship v. Town of Clarkstown, 612 F.3d 97, 101 (2d Cir. 2010) (citing 47 U.S.C. § 332(c)(7)). "[Section] 332(c)(7) of the Act reflects the balance between the national interest of facilitating the growth of telecommunications and the interest of local governments in making decisions based on zoning considerations." T-Mobile Northeast LLC v. Fairfax County Bd. of Supervisors, --- F.3d ----, 2012 WL 664504, at *3 (4th Cir. March 1, 2012).

Pursuant to Section 332(c)(7), local governments retain authority over "decisions regarding the placement, construction, and modification of personal wireless service facilities", § 332(c)(7)(A), but may not "unreasonably discriminate among providers of functionally equivalent services," § 332(c)(7)(B)(i)(I), take actions that "prohibit or have the effect of prohibiting the provision of personal wireless services," § 332(c)(7)(B)(i)(II), or deny a request "on the basis of the environmental effects of radio frequency emissions," § 332(c)(7)(B)(iv). In addition, Section 332(c)(7)(B)(iii) requires that:

> [a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record

Id. Finally, to ensure enforcement of the Act's mandates, the TCA authorizes "any person adversely affected by a final action or failure to act by a State or local government or any instrumentality thereof ... [to] commence an action in any court of competent jurisdiction." § 332(c)(7)(B)(v). Clearwire contends that the Village Defendants violated Section 332(c)(7)(B)(iii) because the Board's denial of its application was not supported by substantial evidence. However, the Village Defendants argue that their denial did not violate Section

6

332(c)(7) because the type of service offered by Clearwire is not subject to regulation by the FCC under the TCA, and therefore the FCC cannot limit their zoning authority.

Under the TCA, a service is subject to a different regulatory framework depending on whether it constitutes an "information service" or a "telecommunications service", the latter of which includes a "commercial mobile service". Although certain technologies were not in existence at the time these definitions were created, in National Cable & Telecommunications Association v. Brand X Internet Services, 545 U.S. 967, 125 S. Ct. 2688, 162 L. Ed. 2d 820 (2005), the United States Supreme Court upheld the FCC's authority to classify methods of broadband Internet access into these pre-existing definitions. In particular, in Brand X, the Supreme Court affirmed the FCC's classification of broadband cable Internet service as an "information service", and the FCC's conclusion that broadband cable Internet service was not a "telecommunications service". Id.

The Second Circuit explained the distinction between a "telecommunications service" and "information service" in Federal Trade Commission v. Verity International, Ltd., 443 F.3d 48 (2d Cir. 2006) as follows:

> A "telecommunications service" (for example, the carriage of a basic voice telephone call) is the offering of "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43), (46). An "information service," on the other hand, offers "a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." Id. § 153(20). Examples include services allowing online browsing or electronic publishing. Id.; see generally Universal Service Report, 13 F.C.C.R. 11501, 1998 WL 166178 (1998) (discussing in depth the meaning of these statutory terms). The FCC has affirmed that the two types of service are mutually exclusive. Universal Service Report, 13 F.C.C.R. at 11507–08, ¶ 13. The FCC has further explained that "mixed or hybrid services," in which the provider "offers a capability for

7

> generating, acquiring, ... or making available information via telecommunications, and as an inseparable part of that service transmits information supplied or requested by the user," are information services and not telecommunications services. Id. at 11529, ¶¶ 56-57.

Id. at 62. In 2007, the FCC issued a decision in In the Matter of Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks, 22 F.C.C.R. 5901 (March 22, 2007) ("the 2007 Declaratory Ruling"), concluding that wireless broadband Internet access service was an "information service" because it "offers a single, integrated service to end users, Internet access, that inextricably combines the transmission of data with computer processing, information provision, and computer interactivity, for the purpose of enabling end users to run a variety of applications" which, "taken together constitute an information service as defined by the Act". 22 F.C.C.R. at 5911, ¶ 26 (footnotes and internal quotation marks omitted).

In addition, the FCC explained that, although "the transmission component used for wireless broadband Internet access is 'telecommunications'", because the use of the telecommunications component is "part and parcel of the Internet access service's information service capabilities", it was not a "telecommunications service". 22 F.C.C.R. at 5913, ¶ 31. Finally, the FCC concluded that wireless broadband Internet access service did not meet the definition of a "commercial mobile service" as defined in the TCA. 22 F.C.C.R. at 5916–18, 5921, ¶¶ 41, 45, 56. Clearwire does not dispute that its' 4G service is properly classified as an "information service" pursuant to the 2007 Declaratory Ruling, and that it is an "information service provider". As the Supreme Court noted in Brand X, "[i]nformation-service providers . . . are not subject to mandatory common-carrier regulation under Title II, though the Commission

has jurisdiction to impose additional regulatory obligations under its Title I ancillary jurisdiction to regulate interstate and foreign communications." 545 U.S. at 976, 125 S. Ct. 2688.

In denying Clearwire's application, the Board determined that because Clearwire's 4G service was an "advanced Internet product" and not a "telecommunications service", it was not subject to the TCA. To support this argument, the Board relied on the D.C. Circuit's decision in Comcast Corporation v. Federal Communications Commission, 600 F.3d 642 (D.C. Cir. 2010), where the court held that the FCC did not have the authority to regulate a cable Internet service provider's network management practices under its Title I ancillary jurisdiction.

The Court agrees with Clearwire that the decision in Comcast is not directly applicable to the instant case. The court in Comcast did not rule that *any* regulation of broadband internet services could not be supported under the FCC's Title I ancillary jurisdiction. It ruled only that the FCC did not have authority to take the particular action at issue in that case, namely "barring Comcast from interfering with its customers' use of peer-to-peer networking applications." Id. at 113. Furthermore, unlike in Comcast, the provision of the TCA challenged in this case does not regulate information service providers, but rather a local zoning board's ability to prevent those providers from deploying their services. Nevertheless, because the Court finds that the plain language of the TCA does not limit a local government's authority over zoning issues involving applications for wireless broadband Internet access service facilities, the Court does not need to resolve the issue of the FCC's authority over information services or information service providers under the TCA.

Whether a local zoning board is limited by Section 332(c)(7)(B) in reviewing an application to construct a facility providing wireless broadband Internet access services is one of first impression in this circuit. In fact, a review of the caselaw reveals that only one other court

9

has addressed this issue. See Arcadia Towers LLC v. Colerain Tp. Bd. of Zoning Appeals, No. 10-CV-585, 2011 WL 2490047, at *2 (S.D. Ohio June 21, 2011) (holding that the plaintiff did not have standing to challenge the defendant's denial of its zoning permit for a communications tower where the tower would only provide Clearwire's wireless broadband internet service, because "the TCA simply does not apply to broadband information service").

Although Clearwire cites extensively to statements, legislation, and rules by Congress, and the FCC lauding the importance of wireless broadband Internet access and the need to facilitate the proliferation of this service, these statements do not guide the Court's analysis. Section 332(c)(7) is a compromise, and as the Second Circuit noted in Sprint Spectrum v. Willoth, 176 F.3d 630 (2d Cir. 1999), they "do not read the TCA to allow the goals of increased competition and rapid deployment of technology to trump all other important considerations, including the preservation of the autonomy of states and municipalities". Id. at 603. Rather, consistent with the statutory analysis of "personal wireless services" set forth by the Second Circuit in Willoth, the Court must determine whether Section 332(c)(7) includes wireless broadband service as part of its definition of "personal wireless services" by looking to "[t]he plain statutory language of [section 332(c)(7)] . . . in conjunction with the appropriate definitions set forth in the TCA". Id. at 641.

Pursuant to Section 332(c)(7), the limitations imposed by Congress on municipal zoning authority relate solely to decisions regarding "personal wireless service facilities", which are defined as "facilities for the provision of personal wireless services". 47 U.S.C. § 332(c)(7)(C)(ii). Accordingly, to be subject to Section 332(c)(7), Clearwire's 4G service must fit into the definition of "personal wireless services". Section 332 defines "personal wireless services" as "commercial mobile services, unlicensed wireless services, and common carrier

10

wireless exchange access services". § 332(c)(7)(C)(i). "Unlicensed wireless services" are in turn defined as "the offering of telecommunications services using duly authorized devices which do not require individual licenses . . . ." § 332(c)(7)(C)(iii).

As previously stated, in the 2007 Declaratory Ruling, the FCC classified wireless broadband Internet access services such as Clearwire's 4G service as an "information service", and concluded that it was neither a "telecommunications service" nor a "commercial mobile service". Thus, based on the FCC's own definition of wireless broadband Internet access service, because the Proposed Facility would be used solely to provide an "information service", it does not qualify as a "personal wireless service facility" subject to the limitations on local zoning authority in Section 332(c)(7)(B). See Arcadia Towers, 2011 WL 2490047, at *2 ("In 2007, the Federal Communications Commission issued a Declaratory Ruling in which it found that mobile wireless broadband Internet access is not a "commercial mobile service" under the TCA. Under such ruling, the TCA simply does not apply to broadband information service.").

Nevertheless, Clearwire contends that the FCC has indicated through numerous statements that wireless broadband Internet access services are subject to Section 332(c)(7). First, Clearwire points to the 2007 Declaratory Ruling, where the FCC stated that, although classifying wireless broadband Internet access service as an information service, the limitations in Section 332(c)(7)(B) remained applicable to siting applications if the service was part of the same infrastructure as a personal wireless service. Specifically, the FCC stated:

> . . . we find that section 332 (c)(7)(B) would continue to apply to wireless broadband Internet access service that is classified as an "information service" where a wireless service provider uses the same infrastructure to provide its "personal wireless services" and wireless broadband Internet access service. We find that classifying wireless broadband Internet access services as "information services" will not exclude these services from the section 332(c)(7) framework when a wireless provider's

> infrastructure is used to provide such services commingled with "personal wireless service." Commingling services does not change the fact that the facilities are being used for the provisioning of personal wireless services. Therefore, application of section 332(c)(7) should remain unaffected. This interpretation is consistent with the public interest goals of this provision and ensures that wireless broadband Internet access service providers continue to use existing wireless infrastructure to rapidly deploy their services. This result is also consistent with the Commission's commitment to its national broadband policy goals to "promote the deployment of advanced telecommunications capability to all Americans in a reasonable and timely manner.

Id. at 5923–24, ¶ 65 (footnotes omitted). In the Court's view, rather than support Clearwire's position, this provision further affirms that the FCC differentiates between information services and the type of personal wireless services subject to Section 332(c)(7) because there would be no need for such a distinction if wireless broadband Internet access service could otherwise be read into the definition of "personal wireless services" in Section 332(c)(7). In addition, the fact that non-commingled siting applications for the provision of wireless broadband Internet access services are excluded from Section 332(c)(7) indicates that the exception for commingled services only limits the zoning board's authority when the proposed facility would also be used for the provision of personal wireless services. Although Clearwire is a Sprint affiliate, Clearwire does not contend that it would be offering the Sprint personal wireless services at the Proposed Facility as part of the same infrastructure.

The Court notes that during the hearing on its application, Clearwire implied that a failure to upgrade to 4G could negatively impact Sprint's personal wireless services, leading to a deficiency in voice services. (Ex. K at 126.) However, Clearwire offered no evidence to support this contention beyond an anecdote about an increase in dropped calls following the release of the iPhone. (Ex. K at 125–26.) Indeed, Clearwire explicitly stated that the "need" for its service was the benefit of 4G and not the "need for the service in a particular area where coverage may

not be provided". (Ex. K at 92.) As explained by Clearwire's representative, the Proposed Facility would benefit the residents of Lynbrook, as well as the residents in the areas connected by the facility, by "enabling them to receive 4G service and to get all the benefits from 4G service. . . the streaming movies, streaming video, video conferencing, downloading files." (Ex. K at 101.) Thus, the fact that Clearwire would be providing the wireless broadband component of Sprint's telecommunications network through the Proposed Facility did not limit the Board's authority in reviewing the application.

Clearwire also relies on the FCC's statements in the <u>Petition for Declaratory Ruling To Clarify Provisions of Section 332(c)(7)(B) To Ensure Timely Siting Review and To Preempt Under Section 253 State and Local Ordinances That Classify All Wireless Siting Proposals as Requiring a Variance</u>, 24 F.C.C.R. 13994 (2009) (November 18, 2009) ("the 2009 Declaratory Ruling). In the 2009 Declaratory Ruling, the FCC interpreted two provisions of Section 332(c)(7). First, the FCC defined a "reasonable time" beyond which inaction on a siting application under section 332(c)(7)(B) constituted a "failure to act". 24 F.C.C.R. at 14022, ¶ 71. Second, the FCC concluded that "where a State or local government denies a personal wireless service facility siting application solely because that service is available from another provider, such a denial violates Section 332(c)(7)(B)(i)(II)". <u>Id.</u> Throughout the course of the 2009 Declaratory Ruling, the FCC couched its discussion of Section 332(c)(7) in terms of its benefit for "wireless services" and "mobile wireless networks" generally, which included mobile Internet services and voice services.

In fact, the FCC explicitly cites delays in Clearwire's efforts to deploy its "next generation broadband networks" when discussing how the "[d]elays in the processing of personal wireless service facility siting applications are particularly problematic as consumers await the

deployment of advanced wireless communications services, including broadband services, in all geographic areas in a timely fashion". 24 F.C.C.R. at 14007, ¶ 35. The FCC concluded that delays in siting applications such as those for Clearwire's broadband network "impede[s] the promotion of advanced services and competition that Congress deemed critical in the Telecommunications Act in 1996 and more recently in the Recovery Act." Id.

Clearwire argues that the statements and examples in the 2009 Declaratory Ruling indicate that the FCC considers siting applications for wireless broadband Internet access services, such as those offered by Clearwire, to be "personal wireless service facilities" over which a local government has limited authority under Section 332(c)(7). That may be so. Nevertheless, there is no indication that the FCC's dicta in the 2009 Declaratory Ruling was intended to amend or replace the FCC's classification of wireless broadband Internet access service as an "information service" in the 2007 Declaratory Ruling. Thus, because the FCC has classified wireless broadband Internet access service outside of the statutory reach of Section 332(c)(7), Clearwire cannot rely on the 2009 Declaratory Ruling to supplant the plain language of the statute. See Arcadia Towers, 2011 WL 2490047, at *2 ("In their briefing and at the hearing, Plaintiffs argue that the TCA does apply to broadband communication based on a subsequent 2009 FCC Declaratory Ruling, which Plaintiffs contend signals a change in the FCC's view, such that broadband communication should be entitled to protection under the TCA. However, the Court has scrutinized such opinion, and agrees with Defendants that it does not overrule the 2007 ruling, nor does it hold that wireless broadband communication services are covered by the TCA. Although the 2009 Declaration speaks in favor of broadband in dicta, it in no way states that broadband communications are encompassed by the TCA.").

The Court agrees with the observation by the court in Arcadia Towers that "the law has not kept up with the changes in technology". 2011 WL 2490047, at *2. "Under such a circumstance it is not up to the FCC to construe the TCA to say something it does not say, nor up to the Court to find broadband communication encompassed by the law." Id. Accordingly, the Court denies Clearwire's motion for summary judgment and grants the Village Defendants' cross-motion for summary judgment and dismisses Clearwire's first cause of action for declaratory and injunctive relief based on violations of the TCA.

**C.  As to the State Cause of Action**

The parties also move for summary judgment on Clearwire's state law claims for declaratory and injunctive relief pursuant to Articles 30 and 78 of the New York Civil Procedure Law and Rules ("CPLR").  Article 78 of the CPLR provides that a party is entitled to relief from a local zoning decision that is "arbitrary and capricious" or is not supported by substantial evidence.  N.Y. CPLR §§ 7803(3) and (4) (McKinney 2008).  Because an Article 78 claim is based on state law and there is no diversity between the parties, it could only be brought into this Court permissively through supplemental jurisdiction.  28 U.S.C. § 1367(a).

As an initial matter, "it is doubtful . . . that claims under Article 78 are even amenable to a federal district court's supplemental jurisdiction." Morningside Supermarket Corp. v. N.Y. State Dep't of Health, 432 F. Supp. 2d 334, 346 (S.D.N.Y. 2006).  "The overwhelming majority of district courts confronted with the question of whether to exercise supplemental jurisdiction over Article 78 claims have found that they are without power to do so or have declined to do so."  Coastal Commc'ns Serv., Inc. v. City of New York, 658 F. Supp. 2d 425, 459 (E.D.N.Y. 2009); see also Morningside, 432 F. Supp. 2d at 346—48 (denying supplemental jurisdiction and declining to "deviat[e] from the well-reasoned and essentially unanimous position of New York

district courts on. . . .[this] issue."); Blatch v. Hernandez, 360 F. Supp. 2d 595, 637 (S.D.N.Y. 2005) (dismissing an Article 78 claim for lack of subject matter jurisdiction, "as New York State has not empowered the federal courts to consider such claims.").

However, even if the Court could exercise supplemental jurisdiction over Clearwire's state law claims, 28 U.S.C. § 1367(c) permits a federal court to decline to exercise supplemental jurisdiction where the claim "raises a novel or complex issue of State law", § 1367(c)(1), or if the court "has dismissed all [federal] claims over which it has original jurisdiction", § 1367(c)(3). "Once [a court's] discretion is triggered under § 1367(c)(3), it balances the traditional values of judicial economy, convenience, fairness, and comity in deciding whether to exercise jurisdiction." Kolari v. N.Y.-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (internal citation and quotation marks omitted).

Here, not only has the Court dismissed the federal TCA claim, but the Court finds that this case raises "novel or complex" issues of State law. First, it is well-settled under New York law that cellular telephone companies are afforded the status of public utilities for the purposes of zoning applications, see Cellular Tel. Co. v. Rosenberg, 82 N.Y.2d 364, 604 N.Y.S.2d 895, 624 N.E.2d 990 (1993), and therefore their applications are reviewed under the "public necessity" standard established in Consolidated Edison Co. v. Hoffman, 43 N.Y.2d 598, 403 N.Y.S.2d 193, 374 N.E.2d 105 (1978). This standard provides that "[r]ather than granting a variance only on a showing of 'unnecessary hardship,' a local zoning board must consider whether the public utility has shown 'a need for its facilities' and whether the needs of the broader public would be served by granting the variance." Town of Oyster Bay, 166 F.3d 494 (quoting Consolidated Edison, 43 N.Y.2d at 608–10, 403 N.Y.S.2d 193, 374 N.E.2d 105).

However, whether a provider of wireless broadband Internet services is a "public utility"

and therefore subject to the "public necessity" standard has not been addressed by New York courts. As Clearwire itself admitted, the question of whether there is a need for its 4G service "is a different question than is typically presented to boards hearing cellular or mobile telecommunications applications", because the need for 4G service "is basically operations in the larger sense of the word and not servicing particular callers in a particular geographical area". (Ex. K at 116–17; see also id. at 92 ("The need for the service in a particular area where coverage may not be provided is what is typically attendant to your ordinary cell applications . . . What we would be considering at that point was whether society needs 4G. And I believe that's not a question for local municipalities.").)

The Court is cognizant of the fact that by not addressing the state law claims, it will lead to a further delay in the resolution of Clearwire's application, which has been pending since October 4, 2010. However, because the Court believes that such an important issue should be first addressed by the New York state courts, the Court declines to exercise supplemental jurisdiction over Clearwire's state law claims and grants the Village Defendant's cross-motion for summary judgment and dismisses the second cause of action, without prejudice.

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED**, that Clearwire's motion for summary judgment on its federal and state causes of action is DENIED, and it is further

**ORDERED**, that the Village Defendants' cross-motion for summary judgment to dismiss the federal cause of action is GRANTED, and it is further

**ORDERED**, that the Village Defendants' cross-motion for summary judgment to dismiss the state cause of action is GRANTED and the state cause of action is dismissed without prejudice, and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case.

**SO ORDERED.**
Dated: Central Islip, New York
March 8, 2012

                                                                                     */s/ Arthur D. Spatt*
                                                                                        ARTHUR D. SPATT
                                                                     United States District Judge